29 C.C.P.A. (Patents)

## HOLISTER et al. v. MAYNARD.

### Patent Appeals No. 4590.

Court of Customs and Patent Appeals.

July 6, 1942.

Carlos G. Stratton, of Huntington Park, Cal. (Charles E. Riordon, of Washington, D. C., of counsel), for appellants.

Frederick S. Lyon and Frederick W. Lyon, both of Los Angeles, Cal. (Harry W. F. Glemser, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal from a decision of the Board of Interference Examiners awarding priority of the subject matter contained in the single count to appellee, Maynard.

The interference involves a design patent of appellants No. 115,335, dated June 20, 1939 on an application filed April 26, 1939, and an application of appellee Serial No. 87,611, filed October 10, 1939, which copied the single claim of the design patent of appellants. Since appellee filed his application subsequent to the issuance of the patent to appellants he has the burden of proving priority of invention beyond a reasonable doubt.

The involved count reads as follows: "The ornamental design for a beater, substantially as shown."

The drawings of the parties are identical, and are reproduced below so that the count may be understood:

In his preliminary statement appellee alleged that he made the first drawings of the involved invention on or about November 1, 1937, but that no written description of the invention was made; that the invention was first explained to others on or about October 15, 1937 and that a full-sized working beater was made prior to October 1, 1937 and was in the possession

of appellee on that date, and that a full-sized machine was operated in Los Angeles, California, on or about October 1, 1937, from which said date it is alleged that appellee actively exercised reasonable diligence in adapting and perfecting the said invention. The appellants allege in their preliminary statement that the first drawing was made of the invention on or about May 19, 1938; that the first written description thereof was made on or about March 20, 1939; that the said invention was first explained to others on or about May 23, 1938; that on or about May 21, 1938, appellants bent a metal frame to a form generally in accordance with the invention; that a cardboard pattern of the invention was made about May 21, 1938; that a wooden pattern of the invention was made on or about May 22, 1938; that on or about May 23, 1938, an estimate of the cost of making dies and shop drawings was obtained; that on or about May 27, 1938, the first order was given for the making of dies and shop drawings for the invention, which shop drawings were completed on or about June 21, 1938; that the said dies were completed on or about October 25, 1938; that the invention was first embodied in a complete full-sized beater on or about October 27, 1938, and that on said date the said device was first successfully operated in the city of Los Angeles, California, and that the exercise of reasonable diligence in adapting and perfecting the invention dates from May 19, 1938. Both sides took testimony and introduced exhibits.

The invention herein relates to a design for a beater or household food mixing device as shown in the illustration above.

The Board of Interference Examiners analyzed the record of both parties and, while stating that the evidence for neither was entirely satisfactory, deemed that the proof offered on behalf of appellee was sufficient to establish beyond a reasonable doubt his priority of invention. The decision of the board is dated December 31, 1940. On February 6, 1941 appellants filed a "Motion to Reopen" the interference for the purpose of retaking the testimony of one of the witnesses for appellee. The motion was denied in a decision signed by a single Examiner of Interferences. No point has been raised by the appellants challenging the jurisdiction of a single Examiner of Interferences to deny the motion. Therefore, as far as this case is concerned we will assume that said examiner acted within the scope of his authority.

It appears that appellee is the inventor of a two-speed beater, patent No. 1,910,303, dated May 23, 1933 upon an application Serial No. 617,427 filed June 15, 1932. The drawings in the patent disclose a large cogged wheel within the circumference of which there is a smaller cogged wheel, in all material respects identical with the cogged wheels shown in the involved invention. The purpose of the two sets of gearing is to permit different speeds of agitating the material to be mixed by the beaters. The shifting from high to low speed in the patent is accomplished by pushing up a small gear wheel positioned near the top of the shaft of one of the agitators, from one set of cogs to the other. The gear wheel on the shaft of the agitator is held in either of its two positions by means of a spring. The gearing elements are actuated by a conventional rotating handle. Generally speaking the drawings of appellee's patent are very similar to those of the involved count, the most notable difference being that in the patent the handle is in a vertical position whereas in the involved count the handle is angled on the top of the device.

It appears that appellee was engaged in the manufacture and sale of his patented device for several years prior to 1938. Parts of that device are said to have been made of stamped or punch-pressed metal. Sales resistance to the distribution of the device was said to be encountered by reason of its being somewhat heavy and awkward in construction, and because women operators complained that in shifting the gearing to change speeds their fingernails were broken. A further complaint was that the mixed material became caught in the lower cross section of the frame which extended to within approximately one-half inch from the top of the agitators, crossing the shafts thereof. Because of the latter complaint it is said the device was difficult to clean.

It appears that the said spring, holding the shaft gearing in position, was not satisfactory. In the spring of 1938 appellee met appellant Holister, who was President of the Holister Coil Spring Manufacturing Company, a partnership, and appellant Wortman, who was sales manager of said company. Appellee was dissatisfied with the gear springs that were in his device, and when he first met appellant Wortman

he was seeking to place an order for springs which would satisfactorily retain the mixer gears in place. In May of that year the parties discussed the manufacture of the mixer of appellee, and on May 27, 1938 a contract was entered into between the parties, which reads as follows:

"Agreement.

"This agreement made and entered into this 27th day of May, 1938 in the city of Los Angeles, State of California, by and between Mark K. Maynard hereinafter referred to as party of the first part and Holister Coil Spring Mfg. Co. hereinafter referred to as party of the second part,

"Witnesseth

"Whereas, party of the first part is the owner of all rights and patents, pertaining to a certain mixer, and is the owner and originator of the name Maynard mixer, which name is to be used in connection with said mixer and

"Whereas the party of the second part known as the Holister Coil Spring Mfg. Co. are equipped to and are desirous of manufacturing and selling same to the public at large,

"It Is Hereby Agreed as Follows, to-wit:

"Party of the first part grants to party of the second part the exclusive right to manufacture and sell without limitation to time or territory the mixer known as the Maynard Mixer.

"In consideration of this contract, party of the second part agrees to finance, dies to die cast the frame, gears, and handles of said mixer. They also agree to finance the manufacture of said mixers as soon as materials are available, and to keep on hand sufficient mixers to meet the normal demand for same at all times.

"It is further understood that the cost of the above mentioned dies are to be deducted from the profits of the sale of said mixer before either party shall receive any portion of the profits.

"It is also understood that these mixers are to be manufactured at actual cost and that both parties shall receive 50% of the net profits from the sale of said mixer after all cost— are deducted.

"The actual cost of manufacturing and delivering of said mixer to the public at large shall be based upon the following:

"Cost of materials such as castings, steel, handles, boxes, cartons, plating, stationery, etc., shall be known as group one

(1) and will be based upon the last actual invoices of these items.

"Cost of packing, shipping, delivering, billing, invoicing, collecting, rent, telephone, compensation insurance, stamping, assembling and etc., shall be known as group two (2). The cost of group two shall be based upon the actual amount of wages paid to productive employes, engaged in the manufacture of said mixers. This amount of wages shall be taken at twice the actual monies paid these employes and that figure shall constitute the actual cost of group two.

"The cost of selling and advertising shall be known as group three (3). These costs shall be based upon actual monies paid salesman, (approved by both parties) for all mixers they have sold and all expenditures incurred for any advertising deemed advisable and sanctioned by both parties.

"It is also understood that any expense incurred through the necessity of promotional sales trips, such as car mileage, train fares, hotel bills, salary etc., shall be entered as a cost and defrayed by profits from the sale of said mixer. Such trips are to be understood and agreed to by both parties.

"It is further understood that the party of the second part agrees not to manufacture, sell, or give away, any part of said mixer to anyone else engaged in the manufacture of any other mixer without the consent of the party of the first part.

"It is further understood that the party of the first part shall not enter into or become a party to the manufacturing of a mixer other than the one herein referred to without the consent of the party of the second part.

"It is also understood that party of the second part agrees to grant a $250.00 credit to party of the first part for dies he ownes, that will be used in the manufacturing of the afore mentioned mixer. This $250.00 credit will be given party of the first part after the afore mentioned die casting and handle dies have been paid for.

"It is further understood that all dies mentioned in this contract shall be the joint property of both parties on a fifty-fifty bases, only after the estimated cost of $1250.00 has been jointly paid by both parties on a fifty-fifty bases from the profits of said mixer.

"In consideration of this contract the party of the first part hereby agrees at all times to give to party of the second part ample protection against any infringements on all patents and rights heretofore mentioned and owned solely by the party of the first part.

"It is understood that the distribution of profits from said mixer shall be made at monthly intervals or at any other specified period agreeable to both parties.

"It is hereby understood that in the event the party of the second part violates any or all of the terms of this contract the party of the first part reserves the right to cancel the manufacturing rights heretofore granted and shall also reserve the right to purchase the interests of the party of the second part in the above mentioned dies.

"It is further understood that in the event the party of the first part violates any or all the terms of this contract the party of the second part reserves the right to purchase the interests of the party of the first part in the afore mentioned dies.

"It is also understood that if at any time the party of the second part is prevented from having sufficient mixers on hand to meet the demand for same through an act of God such as floods, earthquakes, fires, etc., or any circumstance over which they have no control it shall not be considered a violation of the terms of this contract.

"In Witness Thereof, the parties hereto have set their hands and seals the day and year first above written.

"Mark K. Maynard.
"Frank O. Holister,
"Holister Coil Spring Mfg. Co."

Under the terms of this contract two-speed beating devices were manufactured by appellants, all of which said devices are identical with the drawings of the count herein. Stamped on the devices were the legends "Maynard Mixer" and "Patent 1910303".

Appellants made a down payment of $200 to a die casting company for the making of dies to be used in the manufacture of appellee's beaters on May 27, 1938, which is the date of the aforesaid contract.

On March 25, 1939, in a document drawn by counsel for appellants, appellee executed a release to appellants of the said contract, and in the release agreed that ap-

pellants could sell the 2500 mixers manufactured under said contract which it had on hand at that date.

Appellee, it is said, was dissatisfied with his contract for the reason that he had received no returns from the sales of the devices made by appellants. It appears that at the time appellee was in the office of counsel for appellants to execute the release, that counsel asserted the devices made by appellants were not the invention of appellee, but he did not state, and appellee was entirely ignorant of the fact, that the said counsel either had prepared or was about to prepare and file the application of appellants for their design patent, which embodied the design in the beaters made and sold as "Maynard's Mixer" in accordance with the contract. It will be noted that the release is dated March 25, 1939, and the application for appellants' design patent was filed April 26, 1939.

Appellee's testimony, properly corroborated, shows that, prior to his negotiations with appellants concerning the manufacture of the mixers, he had taken one of his mixers and bent the handle to an angle approximating that of the design patent.

One of the corroborating witnesses is a die-maker. He testified that either in November or December 1937 when he had gone to see appellee about some gears he needed for a little model, he saw the Maynard mixer with the straight handle and testified that appellee showed him a drawing of his beater with the straight handle and asked him if it could be die cast. The witness also testified that appellee stated to him he was going to change the model, and asked the witness if it could be die cast with the handle slanted to one side in similar fashion to the offset handle of the involved design patent. The witness was also shown by appellee a drawing of the device with the handle slanted to one side. This witness did not see a device with the offset handle.

Another corroborating witness worked for appellee as a saleslady on a commission basis. She testified that they had discussed improvements to be made in the form of his beater and that appellee intended to shorten the frame thereof and had made many sketches of improvements. She also testified that he had shown her a beater in which he had cut down the frame and moved the handle to an offset position similar to the position of the

handle in the involved count in the fall of 1937. This device, the witness testified, was either Exhibit 3 or one like it. Appellee also testified that that device was shown to appellant Wortman sometime about April 1938. Wortman testified the device was not so shown to him.

As far as the first two witnesses referred to are concerned, their testimony stands without contradiction.

A third witness, Hervey S. Beals, who was the outside salesman for the Los Angeles Die Casting Company, testified for appellee. Despite the fact that the testimony of this witness is somewhat confusing, we do not think that it materially weakened the proof on behalf of appellee. The board in its decision, concerning this confusion, stated as follows:

"Beals, a salesman for the Los Angeles Die Casting Company, testifies that he saw Maynard from time to time through the fall of 1937 and spring of 1938 in an unsuccessful effort to secure a contract for making a die and die-casting mixer parts for Maynard. This witness also claims to have seen exhibit 3, and fixes the time with respect to exhibit 8, an estimate for this job purportedly made on January 27, 1938. Beals' testimony is somewhat confused, however, in that he refers to a so-called "Namac" mixer, the die work for which was handled by his firm and attempts also to fix the date of exhibit 3 with respect to the "Namac" negotiation. It is brought out in the record for Holister and Wortman, that the "Namac" die-casting work, at least as to the preparation of the drawings and dies and production of castings, began about July 1938. While this circumstances is not deemed to discredit Beals' story, nevertheless, it does add an element of uncertainty as to the date when he saw exhibit 3.

"On the basis of this confusion on the part of Beals, Holister and Wortman argue that exhibit 3 could not have been made in 1937 as stated by Maynard and Ray, but sometime in the latter part of 1938. However, Holister and Wortman themselves introduced in evidence a card, exhibit C, on which Beals kept a record of his attempts to secure the die-casting contract for the proposed new Maynard mixer. The contemporaneous notes and dates on this exhibit, far from discrediting the testimony of either Beals or Maynard, corroborate their testimony in essential particulars and also aid in fixing the actual

dates of these efforts as prior to the Maynard-Holister agreement of May 27, 1938."

Exhibit 8, referred to by the board, is on a sheet entitled "Estimate". Appearing on the sheet near the top thereof is the expression "Maynard's Mixer" in pencil. The date on this exhibit is January 27, 1938. At the bottom thereof are two pencil sketches somewhat crude in form, one of which apparently shows a clutch forming portion and the other an offset loop handle. On this exhibit there further appears the expression "App. 400$^{00}$", apparently meaning the approximate figure for making the dies, and the expression "10,000 sets App. 20$^{00}$", seemingly referring to the number of sets to be made. The witness was undoubtedly looking for business, and in connection with his estimate he kept a card, Exhibit C, on the face of which appears the following:

"Maynard Mixer Co.       Gl 8115
   5319 Hollywood Blvd.
1/21 To pick up sample to quote on the first of the week.
1/24 Sample to quote on
1/27 Quoted. Want sketch of how Gears will be made & att.
2/16 Looks like might be job
3/16 Claims will be in in about week or ten days".

On the back of said exhibit appears the following:

"4/1   Maynard is not ready yet but expects soon to be ready for D. C.
4/20 No finances yet.
5/7   Will likely be in with finance man next week
5/25 Working on model
6/16 Nothing new yet".

While there is no year date set out on Exhibit C, nevertheless from Exhibit C taken in connection with Exhibit 8, which sets out the date of January 27, 1938, it is clear to see that the evidence of Beals established that prior to the time that appellee entered into the said contract he had the involved invention.

The "Motion to Reopen" was supported by an affidavit of the witness Beals and an affidavit of counsel for appellants, the latter affidavit alleging reasons as to why the said motion was not filed more promptly. Concerning the affidavit of the witness Beals the Examiner of Interferences stated as follows:

"This affidavit, in the main, appears to be an argument by Beals that his original

testimony fixing certain dates concerning exhibit 3 by reference to another transaction, identified as the 'Namec beater' development, should be accepted while his other testimony fixing the same dates by means of exhibits 8 and C should be disregarded.

"Beals apparently states more or less unequivocally that he 'never saw exhibit 3 nor any other beater shown to me by Maynard, having a bent handle, until I made this suggestion to Maynard within two weeks after June 22, 1938.'

"However, in the immediately succeeding paragraph of this affidavit Beals avers, 'From said exhibits D, E and F it appears that I was confused when I thought that I saw Exhibit 3 in 1937, when it must have been in July, 1938 when I first saw exhibit 3, or any beater similar to it. * * *'

"In the last paragraph of this affidavit ·Beals declares, 'As I stated in my original deposition, I can not remember things by years. Without associating Exhibit 3 with something else that happened, I am unable to state whether I first saw it in 1936, 1937 or 1938, but by the sequence of events, which I am able to remember clearly I know that I never saw Exhibit 3 or any beater with a bent handle similar to it prior to about two weeks after June 22nd, 1938.'

"The manner in which Beals has come to this present conclusion appears from other portions of his affidavit, as follows:

" 'I knew at the time that my employer, Reginald Lenfestey, was giving testimony in this interference and I thought that his testimony would clear up for the Patent Office the date, time and circumstances under which I learned of the Namac beater. Apparently the Examiners of Interferences have not realized the full significance of the testimony of my employer, Mr. Lenfestey.'

" 'Exhibits D and E * * * show that the contract with Namac for this beater was entered into June 22nd, which was in the year 1938, as clearly shown by the date on Exhibit F * * *.'

"It thus appears on the face of the papers that there is no 'newly discovered evidence' in the strict sense but that the witness Beals has only recently decided that he was mistaken in attempting to fix a date for exhibit 3 by reference to anything other than the 'Namac beater' development (represented by Holister and Wortman exhibits D, E and F) in view of the testimony of his employer, Reginald Lenfestey on behalf of the senior party Holister and Wortman.

"The showing herein is deemed insufficient to warrant reopening and retaking the testimony of Beals, or taking any other testimony whatsoever."

It is very clear that the testimony of the witness Beals was not the only testimony upon which the board held that appellee had made a device such as Exhibit 3 prior to any date alleged or proved on behalf of appellants. The changing of his testimony as set forth in his affidavit would to say the least, at the most weaken the probative value of the testimony given in his deposition, but it would not be sufficient to prove that Exhibit 3, which contains the seemingly principal feature of the subject matter in dispute, was made in the summer of 1938. We believe, as stated in the decision on the motion, that "it does not appear that such evidence would be of sufficient importance to be likely controlling on final hearing".

The appellants' testimony, generally speaking, conflicts with that offered on behalf of appellee. It is said that, before the date of the contract but not prior to the dates proved by appellee, they had bent a metal frame to produce one generally in accordance with their design patent.

We cannot believe, in the light of the circumstances· hereinabove set forth, that appellants could possibly have had the invention they allege to be theirs prior to the date of the contract and then have entered into such contract with appellee, in which they clearly acknowledge that the mixers to be made thereunder are the Maynard mixers and to stamp the legends hereinabove mentioned thereon. The exceedingly weak reason given for the appearance of the legends upon the devices is that appellee had insisted upon it ·and that they thought it would aid in the sales of the mixers.

We think that the above evidence, which has been briefly set out, is sufficient to clearly establish beyond a reasonable doubt that appellee was the first inventor of the subject matter involved in the instant count.

It is contended by appellants that based on the testimony of Beals appellee ·was not the original inventor of the design ˙involved herein, for the reason that the design was suggested to him by the witness

Beals. This is of no concern to us as the question of priority involves only the parties to this interference. Raymond et al. v. Wickersham, 110 F.2d 863, 27 C.C. P.A., Patents, 1079.

For the reasons hereinabove set out, it is clear to us that the Board of Interference Examiners committed no error, and the decision appealed from is affirmed.

Affirmed.

LENROOT, Associate Judge, took no part in the consideration or decision of this case.